## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FREDERICK C. TROTTER,** | |
| *Plaintiff,* | |
| v. | **Case No. 1:19-cv-2008-RCL** |
| **CENTER FOR MEDICARE AND MEDICAID SERVICES,** | |
| *Defendant.* | |

## MEMORANDUM OPINION

Plaintiff Frederick C. Trotter sued the Center for Medicare and Medicaid Services ("CMS") under the Freedom of Information Act ("FOIA") to compel disclosure of two types of information: first, the domain portions of email addresses associated with CMS-registered healthcare providers, and second, the providers' corresponding national provider identification numbers ("NPI numbers"). *See* Compl., ECF No. 1. On February 8, 2021, this Court rejected the bulk of Trotter's arguments and granted summary judgment in part to CMS. *See Trotter v. Ctr. For Medicare & Medicaid Servs.*, 517 F. Supp. 3d 1 (D.D.C. 2021). But the Court found that CMS could not withhold the domains of providers who participate in electronic health-information exchange because this information is already disclosed to the public. *Id.* at 9. Accordingly, the Court granted partial summary judgment to Trotter for this narrow subset of the requested information.

Now, Trotter moves for attorneys' fees and costs under 5 U.S.C. § 552(a)(E)(i) for the results of his FOIA litigation. *See* Pl.'s Mot. For Att'ys Fees ("Pl.'s Mot."), ECF No. 37; Pl.'s Mem. in Support ("Pl.'s Mem"), ECF No. 37-12. CMS opposes. Def.'s. Opp'n, ECF No. 40. Trotter filed a reply in support of his motion. Pl.'s Reply, ECF No. 41-16. Upon consideration of

1

the parties' filings, ECF Nos. 37, 37-12, 40, 41, 41-16, applicable law, and the entire record herein, the Court will **DENY** Trotter's motion for attorneys' fees and costs.

## I.   BACKGROUND

Federal regulations require virtually every healthcare provider to register with CMS and obtain a unique identification number (the NPI number). *See generally* 45 C.F.R. ch. 162.  To obtain an NPI number, providers must register with a database and provide certain contact information—including an email address. *See Trotter*, 517 F. Supp. 3d at 1.  Trotter is a "journalist, data journalist, and part-owner and founder" at CareSet Journal. Frederick Trotter Decl. ¶ 1, ECF No. 37-1.  In January 2014, Trotter submitted a FOIA request to CMS for the email addresses associated with each NPI number. *See Trotter*, 517 F. Supp. 3d at 1.  CMS identified 6,380,915 active providers. *Id.* at 4.  But CMS informed Trotter that it would withhold the full email addresses to protect the healthcare providers' privacy. *Id.* Trotter subsequently amended his request to ask only for the domains associated with each provider.[1]  *Id.* CMS—again—asserted the providers' privacy interests and refused to release the domains. *Id.* After exhausting his administrative remedies, Trotter filed this lawsuit to compel CMS's disclosure of (1) the domain portion of the email address associated with each healthcare provider registered with CMS and (2) the NPI numbers associated with these addresses. *See id.*

On February 8, 2021, this Court granted in part and denied in part the parties' cross-motions for summary judgment. *Id.* at 9.  First, the Court rejected Trotter's arguments that CMS's search for records was inadequate. *Id.* at 6.  Next, the Court concluded that CMS had properly invoked the FOIA's privacy exception for withholding the domains of providers who do not participate in

---

[1] "An email address consists of a local-part, the '@' symbol, and a domain. For example, in the email address bevo@utexas.edu, 'bevo' is the local-part and 'utexas.edu' is the domain." *Trotter*, 517 F. Supp. 3d at 1 n.1.

health-information exchange (a digital records sharing program with CMS). *Id.* at 8. However, the Court ordered CMS to disclose the email domains of providers who participate in the health-information exchange because CMS already publicly discloses their information and "[these providers] no longer have an interest in maintaining the privacy of their domains." *Id.* at 7. Rather than receiving information for the 6,380,915 active providers that CMS identified, Trotter received only 203,939 lines of provider information. *See Trotter*, 517 F. Supp. 3d at 1; Frederick Trotter Decl. ¶ 19.

Trotter now moves for $189,685.85 in attorneys' fees and costs pursuant to 5 U.S.C. § 552(a)(4)(E)(i). CMS concedes that Trotter is eligible for attorney's fees under the FOIA, but disputes whether Trotter is entitled to a fee award. Def.'s Opp'n 5. Trotter filed a reply in support of his motion. Pl.'s Reply.

Trotter's motion for attorneys' fees is ripe for review.

## II.   LEGAL STANDARDS

The FOIA permits attorney-fee awards "to encourage [FOIA] suits that benefit the public interest." *LaSalle Extension Univ. v. FTC*, 627 F.2d 481, 484 (D.C. Cir. 1980). Accordingly, courts may assess against the United States attorneys' fees and other litigation costs reasonably incurred in any case when the complainant has substantially prevailed. 5 U.S.C. § 552(a)(4)(E)(i); *see Morley v. CIA (Morley II)*, 894 F.3d 389, 391 (D.C. Cir. 2018). Courts considering whether to grant attorneys' fees consider two prongs—eligibility and entitlement. *See Church of Scientology of Cal. v. Harris*, 653 F.2d 584, 587 (D.C Cir. 1981).

First, a court must determine whether the plaintiff is eligible for fees. This prong is not at issue here. The parties agree that Trotter "substantially prevailed" and is eligible for fees. Pl.'s Mem. 4; Def.'s Opp'n 5; *see Grand Canyon Tr. v. Bernhardt*, 947 F.3d 94, 95 (D.C. Cir. 2020)

(explaining that plaintiffs who "obtained relief" through a "judicial order, or an enforceable written agreement or consent decree" have "substantially prevailed" and are eligible for fees).

But Trotter's eligibility is not the end of the matter. The Court must determine whether Trotter is entitled to fees. *See Jud. Watch Inc. v. Dep't of Commerce*, 470 F.3d 363, 369 (D.C. Cir. 2006) (explaining that eligibility does not determine entitlement under the FOIA). The touchstone of this inquiry is whether an attorneys' fee award is necessary to implement the FOIA. *See Davy v. CIA*, 550 F.3d 1155, 1158 (D.C. Cir. 2008) (citing *Nationwide Bldg. Maint., Inc. v. Sampson*, 559 F.2d 704, 715 (D.C. Cir. 1977)). Four factors guide this inquiry: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents." *Tax Analysts v. Dep't of Justice*, 965 F.2d 1092, 1093 (D.C. Cir. 1992); *see Morley v. CIA (Morley I)*, 810 F.3d 841, 842 (D.C. Cir. 2016). "[T]he first three factors assist a court in distinguishing between requesters who seek documents for public informational purposes and those who seek documents for private advantage." *Davy*, 550 F.3d at 1160. The first category of requesters need a fee incentive to litigate, the latter do not. *Id.* The Court has discretion to balance these factors and determine a fee award. *See id.* at 1158.

### III. DISCUSSION

The parties agree that Trotter is eligible for an attorney-fee award because he achieved a favorable result from this Court. *See Trotter*, 517 F. Supp. 3d at 9; Pl.'s Mem. 4; Def.'s Opp'n 5. The Court agrees and need not engage in an eligibility analysis here.

But the Court, weighing the four factors identified by the D.C. Circuit, finds that Trotter is not entitled to attorneys' fees. Trotter fails to identify a public benefit derived from this case and CMS acted reasonably in withholding the requested information. So, while Trotter's role as a data

journalist weighs in his favor, the Court finds, on balance, that Trotter has failed to establish his entitlement to attorneys' fees.

## A. Trotter Has Failed To Identify A Public Benefit Derived The Case

The first factor that the Court weighs is "the public benefit derived from the case." *Kwoka v. IRS*, 989 F.3d 1058, 1063 (D.C. Cir. 2021). There are two components to the public benefit inquiry. The first analyzes the "effect of the litigation." *Morley I*, 810 F.3d at 844 (quoting *Davy*, 550 F.3d at 1159). The second—and more important component—"requires an *ex ante* assessment of the potential public value of the information requested." *Id.*

As to the effect of the litigation, this component focuses only on whether the litigation caused an agency to release the requested documents. *Morley I*, 810 F.3d at 844 (citing *Davy*, 550 F.3d at 1159). This FOIA litigation caused the release of 203,939 lines of information. *See Trotter*, 517 F. Supp. 3d at 7; Pl.'s Mem. 7. But the mere release of information is not sufficient to swing the public-benefit factor in Trotter's favor. *See Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995) (explaining that the public-benefit prong turns on "evaluat[ing] the specific documents at issue in the case at hand"). Moreover, the public already had access to much of this information. Any effect of Trotter's lawsuit was minimal.[2]

The second (and more important) component of the public benefit inquiry requires the Court to make "an *ex ante* assessment of the potential value of the information requested, with little or no regard to whether the documents supplied prove to advance the public interest."

---

[2] Trotter tries to gain additional mileage from this component by arguing that this case "provided CMS as well as its participants with clear judicial guidance as to what records health providers can expect to remain private, and others that are clearly designed to be public." Pl.'s Mem. 8. The Court is not persuaded. Even if this Court were to consider this argument here, it is a longstanding, established principle that "if identical information is truly public, then enforcement of an exemption cannot fulfill its purposes" and the information must be released. *Niagara Mohawk Power Corp. v. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999). It is hardly the case that the Court's holding in this litigation provided citizens with new or "better tools with which to obtain government information." Pl.'s Reply 8.

*Morley I*, 810 F.3d at 844. While "the release of any government document benefits the public by increasing its knowledge of its government . . . Congress did not have this broadly defined benefit in mind" when authorizing attorneys' fees in FOIA cases. *Cotton*, 63 F.3d at 1120. Instead, Trotter must show "at least a modest probability of generating useful new information about a matter of public concern." *Id.* This includes the possibility that citizens may use the information to make "vital political choices." *Fenster v. Brown*, 617 F.2d 740, 744 (D.C. Cir. 1979).

This second component swings the public-interest factor in favor of CMS. Trotter's fee request relies on many of the same arguments and conclusory statements that the Court previously determined were inadequate. For example, Trotter rehashes his claim that the obtained data provide insights into how CMS performs its statutory and regulatory duties and whether CMS is reducing "waste, fraud, and abuse." *Compare* Pl.'s Mem. 8, *with Trotter*, 517 F. Supp. 3d at 8. But like before, Trotter fails to "show a nexus" between the email domains and "how CMS addresses waste, fraud, and abuse." *Trotter*, 517 F. Supp. 3d at 8. Trotter states that the released data "make[] it simpler to test which provider-to-hospital relationship should be regarded as primary,"—which means the organization is "willing to spend money to enable the provider to exchange healthcare data using CMS-approved digital protocols." Pl.'s Mem. 8. One year on, this assertion is "speculative because he provides no reason to believe that a provider's domain has any connection to his primary organization." *Trotter*, 517 F. Supp. 3d at 9. Nor does Trotter explain how a domain link between an individual provider and their associated organization illuminates whether the organization is "willing to spend money to enable the provider to exchange healthcare data using CMS-approved protocols." Pl.'s Mem. 8, *see Trotter*, 517 F. Supp. 3d at 9 ("Trotter[] . . . does not explain how knowledge about a provider's primary organization leads to information about clinical

6

approach."). Finally, Trotter again fails to explain how the data obtained is useful to detecting waste, fraud, and abuse. *See Trotter*, 517 F. Supp. 3d at 9.[3]

Trotter's belated attempts to plug the holes in his sinking arguments cannot succeed. In his reply, Trotter explains how the domains were used in his study and provides a copy of the study itself. *See, e.g.*, Pl.'s Reply 5–8; Alma Trotter Decl. ¶¶ 22–29, ECF No. 41-1. Because he raised these arguments for the first time in his reply filings, they are forfeited. *See MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 575 (D.C. Cir. 2010). The Court could not consider them anyway, for this factor requires an "*ex ante* assessment" of potential value. *Morley I*, 810 F.3d at 844.[4]

Finally, Trotter contends that he "has demonstrated his ability to disseminate the information obtained by this litigation to a high degree" through his website, newsletter, and data sharing processes. Pl.'s Mem. 7. This argument does not affect the Court's public-benefit analysis. Nearly half of the information that CMS released was already available to the public. *See* Alma

---

[3] Trotter repeats his claims that the data will facilitate epidemiological studies, but he again fails to explain how those studies shed light on CMS's functions as opposed to public health issues in general. *See Trotter*, 517 F. Supp. 3d at 8 n.4.

[4] Even if Trotter overcame these two hurdles, the Court remains skeptical that Trotter can show a nexus between the released domains and the public interests that he identifies. Given the forfeiture, the Court will provide only a brief preview of potential issues here. Trotter appears to have used the domains' corresponding websites to conclude that thousands of providers receiving incentive funding from CMS do not permit patients to receive their healthcare records electronically. *See* Alma Trotter Decl. ¶¶ 24–29. But Trotter provides no explanation of the regulatory framework governing payments under CMS's incentive program. If individual providers receiving incentive payments must certify that they are complying with the program, why should the inquiry as to whether they provide patients with electronic access to healthcare records end with their associated clinical organization's website? *See* Alma Trotter Decl. ¶ 53; ECF No. 41-10 at 5. *See generally* Center for Medicare & Medicaid Services, Public Use Files, https://tinyurl.com/2uxndhry; Center for Medicare & Medicaid Services, Registration & Attestation, https://tinyurl.com/2sn69s8t, ECF No. 41-10. Presumably, providers receiving incentive payments as individuals may have their own methods of providing electronic access to records that are not related to an associated clinical organization. *See Trotter*, 517 F. Supp. 3d at 9.

And beyond patients' electronic access to healthcare records—which is the focus of Trotter's study—CMS's incentive program has other objectives. *See, e.g.*, Center for Medicare & Medicaid Services, Medicare and Medicaid Promoting Interoperability Program Basics, https://tinyurl.com/mw4rd465 (identifying "Electronic Prescribing, Health Information Exchange, and Public Health and Clinical Data Exchange" as additional objectives). At this juncture, Trotter fails to show how the funds identified are the subject of waste, fraud, and abuse when they may well be furthering CMS's additional objectives.

Trotter Decl. ¶ 53. And there is "no public interest" in releasing documents already provided to the public. *Hooker v. U.S. Dep't of Health & Hum. Servs.*, No. 1:11-cv-1276 (ABJ), 2013 WL 12468053, at *4 (D.D.C. Oct. 11, 2013).

For these reasons, the Court finds that the first factor weighs heavily in favor of CMS.

## B. The Commercial Benefit to Trotter and The Nature of Trotter's Interests In The Records Sought Lean In His Favor

The second and third entitlement factors lean in favor of Trotter. These factors address whether Trotter had a "sufficient private incentive" to pursue his FOIA request even without the prospect of obtaining attorneys' fees. *McKinley v. Fed. Hous. Fin. Agency*, 739 F. 3d 707, 712 (D.C. Cir. 2014) (citing *Davy*, 550 F.3d at 1160). These factors "'generally' should weigh in favor of scholars and journalists 'unless their interest was of a frivolous or purely commercial nature.'" *Kwoka*, 989 F.3d at 1064 (quoting *Davy*, 550 F.3d at 1160–61).

Trotter does not have a personal or commercial interest in this case. Rather, he has acted within the scope of his professional role as a "data journalist." Pl.'s Mem. 1; Def.'s Opp'n 17. CMS does not contend that Trotter's scholarly interests are frivolous or purely commercial. Instead, CMS focuses on the structure of Trotter's business, CareSet Journal. *Id.* CMS argues that that because CareSet Journal's commercial arm is "tight[ly] link[ed]" with its journalistic arm, Trotter has personal and commercial interests in the information that are "sufficient to ensure the vindication of the rights given in the FOIA." *Id.* (citing *Fenster v. Brown*, 617 F.2d 740 (D.C. Cir. 1979)). The Court is not persuaded.

These two factors should "generally aid scholars and journalists even if, in some cases, they do not weigh strongly in a plaintiff's favor and therefore ultimately 'do little to advance [their] position' when weighing all four factors." *Kwoka*, 989 F.3d at 1064–65 (quoting *McKinley*, 739 F.3d at 712). Trotter rightfully points out that even if CareSet Journal receives a pecuniary benefit

8

from NPI numbers and domain names, journalistic efforts are special. *Kwoka*, 989 F.3d at 1064. Other news organizations might have "tight linkage" between their commercial and journalistic arms—but the D.C. Circuit and courts in this district have time and again recognized that these entities are "among those whom Congress intended to be favorably treated under FOIA's fee provision." *Davy*, 550 F.3d at 1162; *see WP Co. LLC v. U.S. Small Bus. Admin.*, 514 F. Supp. 3d 267 (D.D.C. 2021); *Washington Post v. U.S. Department of Defense*, 789 F. Supp. 423 (D.D.C. 1992). So too here. "[S]cholarly interest, regardless of private incentive, generally should not be considered commercial." *Kwoka*, 989 F.3d at 1065. Since CMS does not refute Trotter's role as a journalist (data journalist or otherwise), the Court will not treat his interest as commercial.

Accordingly, the Court finds that the second and third factors weigh in favor of Trotter. But while these factors weigh in favor of Trotter because of his uncontested status as a "data journalist," they do "little to advance [his] position when weighing all four factors." *McKinley*, 739 F.3d at 712.

## C. CMS Acted Reasonably

The final factor cuts decisively in favor of CMS. This factor requires the Court to evaluate whether CMS "had a reasonable basis in law" for opposing disclosure and whether CMS was "recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior." *McKinley*, 739 F.3d at 712 (internal citations omitted). It is the agency's burden to show that it had a colorable or reasonable basis for not disclosing the material. *Edelman v. Sec. & Exch. Comm'n*, 356 F. Supp. 3d 97, 108 (D.D.C. 2019) (quoting *Davy*, 550 F.3d at 1163). "If the Government's position is correct as a matter of law, that will be dispositive. If the Government's position is founded on a colorable legal basis in law that will be weighed along with other relevant considerations in the entitlement calculus." *Davy*, 550 F.3d at 1162 (citations omitted); *see Kwoka*,

989 F.3d at 1159 (explaining that while "no one factor is dispositive . . . the court will not assess fees when the agency has demonstrated that it had a lawful right to withhold disclosure"). This inquiry focuses on the reasonableness of the agency's position throughout the litigation, even if the Court ultimately ordered disclosure. *See Edelman*, 356 F. Supp. 3d at 108.

CMS contends that, in response to Trotter's first request, it reasonably withheld the full email addresses of providers to protect their personal privacy. Def.'s Opp'n 12. Even Trotter seems to agree that CMS's initial assertion of the FOIA's personal-privacy exemption (Exemption 6) was reasonable because he amended his request from "the email addresses of the healthcare providers" to just "the domain names of all healthcare providers' email addresses." *Id.* at 8.

After considering Trotter's amended request, CMS again invoked FOIA Exemption 6. This Court agreed that CMS "demonstrated privacy interests in shielding the domains of providers who do not participate in heath-information exchange . . . [and Trotter] identified no public interest in disclosing them." *See Trotter*, 517 F. Supp. 3d at 9. CMS's decision to withhold most of the requested domains was not only reasonable, it was also correct. And Trotter is not entitled to fees where the government's actions were legally justified. *See Davy*, 550 F.3d at 1162.

The remaining issue is whether the other, wrongfully withheld domains affect how the Court balances this factor. They do not. Trotter's success in this litigation stems only from CMS's failure to segregate the 3.2% of domains for providers that participate in a health-information exchange. But Trotter does not appear to have argued—until this litigation—that CMS needed to segregate domains of providers that participate in health-information exchange from the other domains. Trotter's FOIA request did not distinguish between these two categories of domains. *See* ECF No. 23-6. Instead, Trotter focused his segregation arguments on whether CMS could segregate solo practitioners from all other healthcare providers. *See* ECF No. 25-1 at 9.

In light of these broad requests, the Court concludes that CMS's withholdings were reasonable. CMS implemented a global response rooted in sound FOIA principles, its policy notice in the Federal Register, and good faith. None of CMS's summary-judgment filings disputed the release of these specific domains or this particular issue. *Cf. Kwoka*, 989 F.3d at 1066. For the small subset of domains that were ultimately released, the Court agreed with CMS that there is *no* public interest in their disclosure. *See Trotter*, 517 F. Supp. 3d at 9. And in regard to the privacy interests at stake, the released data indicate that not all the domains of providers participating in information exchange were even previously available to the public. *See, e.g.*, Alma Trotter ¶ 51.

At bottom, the Court cannot say that CMS's position was unreasonable or that CMS's behavior was "recalcitrant" or "obdurate" when it was correct on the vast majority of its claims and the legal framework that was the focus of this litigation. *See People for the Ethical Treatment of Animals v. USDA*, No. 1:03-cv-195, 2006 WL 508332, at *5 (D.D.C. Mar. 3, 2006) (concluding that, if an agency prevails "on the majority of its [FOIA exemption] claims, its overall position was reasonable"). Based on its legal position, the Court concludes that CMS acted reasonably in its withholding. This factor weighs heavily in favor of CMS.

Upon consideration of the four factors, the Court finds that the balancing test weighs in favor of CMS and that Trotter is not entitled to attorneys' fees.

## IV.   CONCLUSION

Based on the foregoing, the Court will deny Trotter's motion for attorneys' fees by separate order.

Date: _3/29/22_

Royce C. Lamberth
United States District Judge